### IN RE TRUST CREATED BY ANDREW R. WATLAND. JOHN L. BRIN AND ANOTHER v. FRANCES KATHRYN SHERILL AND ANOTHER.[1]

October 10, 1941.

Nos. 32,840, 32,901, 32,944.

[1]Reported in 300 N. W. 195.

*W. B. Richardson* and *Meighen, Knudson & Sturtz,* for appellants.

*James T. Spillane* and *Simon Meyers,* for respondents.

JULIUS J. OLSON, JUSTICE.

The trustees appeal (1) from an order revising, amending, and surcharging their account covering their administration from the date of its creation, February 19, 1936, until April 5, 1940, and removing them from office "because of their utter disregard of the provisions of said trust instrument, and their improvident administration of the trust"; (2) from a later order appointing another to the office of trustee; and (3) from a still later order requiring the trustees to turn over to their successor all of the trust assets and prohibiting and restraining them from disbursing or transferring any moneys or property belonging to the trust estate. As the first order is determinative of the others, we shall first direct our attention to it.

A rather complete summary of facts is deemed helpful. The trust donor had accumulated property worth more than half a million dollars in chain-store operations. The principal portion of his fortune consisted of 6,320 shares of J. C. Penney stock. He was one of the moving factors during the early years of that company's existence. The stock cost him only a small fraction of what it was worth at the time the trust here involved was created.

Prior to the making of the trust instrument the donor had transferred 3,000 shares of the Penney stock to his wife, who was then ill. She, by will, created a trust for the benefit of their two children, one their natural child, the other an adopted one. Donor's wife died in December 1934 while they were residents of Florida. The administration of her estate was there carried to finality, and what happened there insofar as her estate is concerned is not material here.

Prior to making the trust instrument, donor had been confined in several institutions because of nervous breakdowns. During 1934 and part of 1935, he was a patient in a mental hospital, having been found insane by a competent court. During the course of his confinement his property interests were in the hands of his brother-in-law, Mr. Brin, one of the trustees. Mr. Brin until then had been an active practitioner at law, located at Stewartville, this state. He and his wife had taken charge of the home of the trust donor in 1934 during the last illness of Mrs. Watland. In April 1935 the probate court which had committed donor made an order restoring him to capacity. On February 19, 1936, donor created the trust instrument which is the subject matter of this litigation. The items of property going into the trust were listed in a schedule attached to the original agreement. The trustees estimated the value thereof at $350,597.11. That property so coming to them was still in their possession on July 10, 1937, when they petitioned the district court of Olmsted county for an order authorizing a large loan.

Immediately upon execution of the trust agreement they were invested with possession of the property but took no steps to bring the matter into or before any court. On May 20, 1937, the donor and the trustees entered into a supplemental agreement whereby the situs of the trust was changed from Florida to this state. The reason was said to be that the donor and the trustee Brin had established their respective residences at Stewartville, in Olmsted county; that they intended to retain their residences there and to have in their possession in that county all the personal property belonging to the trust, including the records and accounts relating thereto. Their petition to have the district court of that county assume jurisdiction was granted, and they proceeded immediately with the administration of the trust pursuant to jurisdiction so assumed. They never filed an inventory of the trust property. Aside from the jurisdictional proceedings just mentioned, nothing appears to have been done under the direction of the court except

that a $60,000 loan was made for reasons and purposes hereafter to be stated.

The trustees in administering their trust kept no separate account of the corpus and income thereof. Their only account is a statement of receipts and disbursements. Thus they entered as receipts not only the dividends amounting to $69,780 received from the Penney stock, but likewise some $77,400 received from the sale of 1,000 shares of that stock. They did not determine whether any particular amount coming to them should be treated as income or corpus.

It is necessary to recite the essential portions of the trust indenture. The fifth paragraph is the one upon which the trustees principally rely. Thereby they were authorized—

"To determine whether or not money or property coming into their possession shall be treated as principal or income, and to charge or apportion expenses or losses to principal or income, according as they may deem just and equitable."

In the fifteenth paragraph the agreement provides:

"It is mutually agreed by and between the parties hereto as follows:

"1. The Trustees are authorized, empowered and directed, out of the net income of this trust estate, to pay to the Donor, Andrew R. Watland, for and during his natural life, One Thousand ($1,000.00) Dollars quarterly each year, the first payment to be made July 1, 1936; provided, however, should the above stated sums so authorized to be paid be insufficient with which to meet all of the needs of life of the said Donor and he make demand therefor, the Trustees are authorized, empowered and directed to pay to him other and further sums from the income of said trust estate, provided the payment thereof in the discretion of the Trustees is not burdensome upon this trust estate. Should the Donor become incapacitated through illness, or otherwise, so as to render him incapable of administering his own affairs, then the Trustees are authorized, empowered and directed to expend for and on his be-

half such sum or sums as he would be entitled to receive as hereinbefore set out, and such expenditures will be considered as though paid direct to the Donor."

In addition, the trustees were authorized to pay a sister of the donor certain sums per month during her lifetime. They were also directed, upon the death of the donor and after payment of expenses, charges, advances, and loans, including their compensation as trustees under the trust agreement, to pay all of donor's just debts and funeral expenses, and certain specific items to various churches and individuals. The residue they were directed to pay to the two daughters in equal shares when each arrived at the age of 35 years. In the meantime, the income of the remainder was to be paid to them. The trustees were not required to give any bond, but the obligations of the agreement were extended to and made obligatory upon the executors, administrators, legal representatives, successors, and assigns of the parties thereto.

In May 1936 the donor brought proceedings in the probate court of Pinellas county, Florida, for the removal of Myrtle K. Hurley, appointed under the terms of his wife's will as guardian of the persons and estate of his two minor children, and for the appointment of Mrs. Brin, wife of trustee Brin, or some other suitable person in her place, and for an accounting. That matter was bitterly litigated but finally resulted in the defeat of donor's contentions. We need not go further into that affair except to cite the following cases decided by the supreme court of Florida: Watland v. Hurley, 133 Fla. 317, 183 So. 255; State ex rel. Watland v. Hurley, 132 Fla. 892, 182 So. 442; State ex rel. Watland v. Hurley, 137 Fla. 488, 188 So. 771. In these proceedings donor spent more than $40,000. Included in that are $16,500 paid for detective services.

Between the date of the trust instrument, February 19, 1936, and April 5, 1940, when the account was filed, the trustees disbursed $105,289.30 to the trust donor. The manner in which this was done may be summarized thus: The trustees would issue

their checks payable to the donor from time to time, and he in turn would write his own checks against the fund so created to pay the various items expended. There is no question that all these expenditures were paid out of the trust fund by the trustees with the full knowledge of their ultimate use and purpose. Also to be noted is the fact that payment of all moneys to the donor by the trustees took place after the execution of the trust agreement, and by far the greater portion was paid after the trust property had been removed to Minnesota and was here for administration.

Amongst the various disbursements, it is interesting to note that trustee Brin received checks from the donor amounting to $37,-634.97. In addition, members of the trustees' families received various items, so that the total, including trustee Brin's portion, amounted to nearly $54,000. Brin received $5,000 per year during that time. In addition, he also received $500 per month from donor "for board, housing and compensation."

On July 12, 1937, the trustees made an *ex parte* application to the trial court for authority to borrow $60,000 to pay the federal gift tax amounting to approximately $30,000, claimed personal financial needs of the donor which were said to be greatly in excess of anticipations, amounting to not less than $20,000, in order for him to live comfortably and pay his obligations, also for expenses incurred, including attorneys' fees in Florida and Minnesota still remaining unpaid. During that year the dividends received on the Penney stock amounted to $25,730. The court issued an order authorizing the loan. The proceeds were entered as receipts in the trustees' account. Later, 1,000 shares were sold for approximately $77,500. That sum, too, was entered under the heading "receipts" and disbursed as if it were income.

The controlling questions here are stated by the trustees to be:

(1) "What money and property coming into the possession of the trustees may be treated by them as income," and (2) "were the trustees empowered to furnish the trust donor with whatever

money was necessary from either principal or income to enable him to meet his valid debts."

They earnestly contend (1) that the court "unreasonably limited its definition of 'income' and that under the trust instrument sufficient income existed to pay all disbursements that were made," and (2) that whether it was "income or no income, disbursements to the trust donor to meet his valid debts were proper [properly made] from the principal, because the creditors of the trust donor both before and after the trust instrument could reach all of the assets in the trust."

■ First to be determined is donor's intention as expressed in the language used in the trust instrument. In that determination we are to be guided by the well known principle that the entire instrument must be considered, "aided by the surrounding circumstances, due weight being given to all its language, with some meaning being given, if possible, to all parts, expressions and words used, discarding and disregarding no parts as meaningless, if any meaning can be given them consistently with the rest of the instrument." Dumaine v. Dumaine, 301 Mass. 214, 218, 16 N. E. (2d) 625, 628, 118 A. L. R. 834, 839; In re Trusteeship Under Will of Ordean, 195 Minn. 120, 261 N. W. 706.

■ So applying the law to the facts here presented, we think it is apparent that the authority on the part of the trustees to provide donor with "all of the needs of life" should be given a broad interpretation. But such discretion was nevertheless limited by the question whether such payments were "burdensome upon this trust estate." Furthermore, we cannot eliminate the express provisions of the fifteenth paragraph, whereby the donor and the trustees "mutually agreed" that "out of the net income of this trust estate" donor was to be paid $1,000 quarterly. If that sum should prove "insufficient with which to meet all of the needs of life of the said donor and he make demand therefor, the trustees are authorized * * * to pay to him other and further sums *from the income of said trust estate, provided the payment thereof*

*in the discretion of the trustees is not burdensome upon this trust estate."* (Italics supplied.) We conclude that the trustees thereby were limited to the income available for the payments so to be made. We arrive at this conclusion not only because we must give effect to the general purpose of the trust, but also because it is obvious here that the donor, in view of his past experiences, sought to place his property beyond his own control so that he might be relieved of practically all his financial affairs. When this agreement was made it is apparent that he was then conscious of the dangers that might ensue were he left free and untrammeled in the handling of his own property. At least four times he had suffered mental disturbances to such extent that he finally had been committed as an insane person. That he had the right so to protect his own property against what might happen if there were a recurrence of his mental disturbance is obvious.

■ While the discretion granted to the trustees is broad, no one will contend that the discretion so vested goes beyond sound judgment and a reasonable and prudent discretion. After all, it was the duty of the trustees to exercise their powers and discretion in such fashion as inheres in a fiduciary relation. It could not be exercised unrestrained. They were bound to exercise a "soundness of judgment which follows from a due appreciation of trust responsibility." Dumaine v. Dumaine, 301 Mass. 214, 220, 16 N. E. (2d) 625, 629, 118 A. L. R. 834, 840. That this is so we think is obvious, since, if the power granted be construed as broadly as the trustees seek to have us do, their administration would be uncontrollable and might destroy every purpose of the trust. That the donor had any such intention is unthinkable. Naturally and properly, the future welfare of his children, for whom he undoubtedly had all the fondness of a devoted parent, was an important, perhaps the principal, consideration in his mind. The income from the trust estate was more than adequate to take care of all requirements needed or likely to be needed by him under the circumstances without in any way encroaching upon the principal.

The facts recited are such, we think, as to indicate beyond question that the trustees were wholly unmindful of their fiduciary obligations as trustees and simply treated the whole trust estate as if it were available for anything wanted by the donor. Thus, too, the large sums paid indirectly to themselves bespeak a disregard of fiduciary propriety and official duty.

■ It is claimed that the fifth paragraph, heretofore quoted, gave the trustees authority to treat the proceeds of the sale of the Penney stock as income instead of as principal. With this contention we cannot agree. First of all, it is to be noted that they made no application to any court for an interpretation of the trust agreement so that they might have the benefit of judicial construction of this most important, or at least very doubtful, point. Secondly, they handled this, not as items of income, but as receipts, and disbursed the money without so much as ascertaining or determining whether it should be in fact so treated. Thirdly, if they had exercised such power, we think there can be no doubt that such exercise would have to be considered an arbitrary one. This is patently so where, as here, the residuary beneficiaries would suffer great losses by such a determination.

It is the general rule that, in cases of a trust, gains resulting from the purchase and sale of securities are accretions which belong to and become a part of the principal of the trust fund rather than income. Dumaine v. Dumaine, 301 Mass. 214, 217, 16 N. E. (2d) 625, 627, 118 A. L. R. 834, 838; In Re Trust Under Will of Clarke, 204 Minn. 574, 580, 581, 284 N. W. 876, and cases there cited. That is the proper rule to apply here, and the trial court's holding that the corpus of the trust had been wrongfully invaded by the trustees and that as such they should be held responsible for the loss thereby caused is well sustained by the evidence.

■ But, the trustees say, since under paragraph 16 they are authorized, upon the donor's death, to pay all of his just debts, therefore the claims paid in the Florida litigation, and other items

met, could be enforced against the trust donor and the trust estate; hence they were authorized to pay the donor the required sums by him applied toward the payment of his creditors and that they should be allowed to take credit therefor in their account. They cite and rely upon 1 Scott, Trusts, § 156, as authority for this claim. It will be noted, however, that the author limits the rights of such creditors to the extent "the settlor himself takes an interest under the trust," and that such "interest is subject to the claims of his creditors." The reason for such a holding is that "it is against public policy to permit the owner of property to create for his own benefit an interest in that property which cannot be reached by his creditors." 27 C. J. [§ 344] 2, p. 600. That rule is well established here and elsewhere.

Our own cases, cited and relied upon by appellants, are not of aid to them here. In Wetherill v. Canney, 62 Minn. 341, 64 N. W. 818, the question involved was whether the transfer was made with the intention of defrauding grantor's creditors. To the same effect is Williams v. Kemper, 99 Minn. 301, 109 N. W. 242, where the court held that any transfer of real or personal property by debtor to a third party to be held in trust for the use and benefit of the debtor is void as to existing and subsequent creditors. And in Capital T. & S. Bank v. Knauft, 172 Minn. 83, 214 N. W. 771, the holding is that property held in trust for a debtor may be subjected to the payment of the claims of his creditors. It is to be noted also that in these cases there was no question of the rights of remaindermen. Here there were at the time of the creation of the trust no obligations against the trust donor nor was the trust created with any intent or purpose to hinder or delay present or future creditors.

The court in its order adjusting the account charged the trustees with all items of income, the principal portion, $69,780, being dividends on the Penney stock. They were also charged with income from house rent, $2,414.50; dividends on insurance policies, $185.85; and tax refunds of $1,018.52, amounting in all

to $73,398.87. They were credited with all taxes paid and with $49,700 paid to the trust donor. Other items for which they received credit were interest paid on the $60,000 loan, life insurance and other insurance premiums, attorneys' fees, and miscellaneous items, so that in all, together with the cash on hand ($2,501.09 according to the account rendered), the total credits balanced the total income. The court was of the view in allowing these credits "that the trustees had no right to refuse any demands of the donor as long as there was income available for their payment." We need not inquire whether the court allowed these credits too liberally since there is no appeal on the part of respondent objectors.

To the trial judge, the sale of the Penney stock, treating the proceeds thereof as "income," seemed "absurd." Of course, the court was right. If 1,000 shares could be so sold and so misapplied as here, why might they not also have disposed of the remaining 2,300 shares and similarly dissipated practically the whole trust estate? The trustees were, as fiduciaries and under the terms of the trust indenture, bound to maintain and preserve the corpus of the trust estate. This they failed to do, and the resulting loss properly falls upon them.

Each of the orders here for review is affirmed.